DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LARRY DARNELL YOUNG,**
Appellant,

v.
**STATE OF FLORIDA,**
Appellee.

No. 4D2023-1056

[September 25, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Howard K. Coates, Jr., Judge; L.T. Case No. 50-2021-CF-10250-AXXX-MB.

Carey Haughwout, Public Defender, and Patrick B. Burke, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Anesha Worthy, Senior Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

Appellant, Larry Darnell Young, appeals his convictions and sentences for manslaughter and attempted manslaughter. He contends that the trial court erred in denying his motion to suppress Facebook records obtained from a warrantless search, arguing that the trial court wrongfully applied the good-faith exception to the exclusionary rule. We agree and reverse.[1]

### *Background*

A young girl was tragically shot and killed by a stray bullet from a nearby altercation while she and her parents were sitting in their car. The shooting was the culmination of an argument between appellant's girlfriend, Keosha Carn, and her aunt. The aunt and her friend ran into Carn outside of another woman's house. The women began arguing and exchanged several heated threats, with Carn saying she was going to "have [her] baby daddy come shoot you all." Soon after Carn made this threat,

_____
[1] We affirm all other issues raised without comment.

appellant arrived at the scene, shots were fired, and the young girl was struck by a stray bullet.

Witnesses identified appellant as the shooter, but he denied involvement, testifying that he had left the scene quickly after arriving because he had children in his car. Although appellant has a child with Carn, he denied being the "baby daddy" whom she had referenced. He testified that Carn has five additional children with five other men. Appellant and Carn were indicted for first-degree murder for the shooting of the young child, for two counts of attempted first-degree murder of the aunt and her friend, and for two counts of attempted second-degree murder of the young child's parents who were in the car with her.

### *The Facebook Records*

After appellant was identified as a suspect, a Palm Beach County Sheriff's detective applied for a search warrant to search the Facebook account of "Stunt Young," believed to be appellant's account. The trial court initially signed the warrant, but in February 2023 the trial court granted appellant's motion to suppress the records obtained, because the detective could not articulate his probable cause for the warrant at the hearing. Shortly after the trial court granted this motion to suppress, the prosecutor approached another detective with the Sheriff's office and inquired about obtaining the Facebook records from a subpoena. That detective told the prosecutor that Facebook records from the same account had been obtained several months earlier pursuant to a search warrant for retail theft and organized fraud (the "Theft Warrant") involving appellant, which was unrelated to the shooting.

Through the Theft Warrant, the sheriff's office had obtained records of appellant's Facebook activity between July 7, 2021, and December 11, 2021—the day after the shooting. After notifying the prosecutor of these records' existence and without applying for his own search warrant, the detective searched through these records and reviewed appellant's messaging history, which linked appellant to a phone number that Carn had called shortly before the shooting, and which contained a picture of appellant brandishing a gun matching the description of the gun used in the shooting.

Appellant filed a motion to suppress the evidence obtained during the search through the Theft Warrant's Facebook records, contending that the detective did not have a warrant to search the records for evidence in the

murder case. Appellant argued that the detective needed to secure a second warrant to search the Facebook records for homicide evidence.

The State argued that even if the detective was required to secure a second warrant before searching the Facebook records, the evidence should not be suppressed under the good-faith exception to the exclusionary rule. The State contended that the detective reasonably believed his actions were lawful, because he only had searched through evidence compiled pursuant to a valid search warrant, albeit a warrant for a different crime. The trial court denied appellant's motion to suppress the Facebook records, finding that although the detective's warrantless search violated the Fourth Amendment, the circumstances fit the good-faith exception to the exclusionary rule.

At trial, a jury found appellant guilty of the lesser-included offenses of manslaughter and attempted manslaughter. Appellant was sentenced to a total of forty years in prison. This appeal follows.

## *Analysis*

### Standard of Review

"[T]he standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." *Bryan v. State*, 62 So. 3d 1244, 1245 (Fla. 4th DCA 2011) (alteration in original) (quoting *State v. Goodwin*, 36 So. 3d 925, 926 (Fla. 4th DCA 2010)).

### Reasonable Expectation of Privacy in the Facebook Records

The Fourth Amendment of the United States Constitution protects people against unreasonable searches and seizures, requiring law enforcement to obtain a search warrant based on probable cause "and particularly describing the place to be searched, and the persons or things to be seized." Amend. IV, U.S. Const. In order to trigger Fourth Amendment protections, a person must have a reasonable expectation of privacy in the area to be searched. *E.g.*, *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court held that people have a reasonable expectation of privacy in their cell phone data, and that law enforcement must obtain a warrant to search such data. *Id.* at 403 ("Our answer to the question of what police must do before

searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."); *see also Smallwood v. State*, 113 So. 3d 724, 736 (Fla. 2013) (quoting *State v. Smith*, 920 N.E.2d 949, 955 (Ohio 2009)) ("*Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased.* But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents."); *State v. Worsham*, 227 So. 3d 602, 604 (Fla. 4th DCA 2017) ("Modern technology facilitates the storage of large quantities of information on small, portable devices. The emerging trend is to require a warrant to search these devices.").

Although the search at issue was of a Facebook account, the same privacy concerns apply because the detective garnered the evidence at issue through appellant's private messages, which are analogous to a cell phone's text messages. Several federal courts have recognized a reasonable expectation of privacy in a person's private social media content. *See United States v. Zelaya-Veliz*, 94 F.4th 321, 333 (4th Cir. 2024) ("Most federal courts to rule on the issue have agreed that Facebook and other social media users have a reasonable expectation of privacy in content that they exclude from public access, such as private messages."); *United States v. Chavez*, 423 F. Supp. 3d 194, 205 (W.D.N.C. 2019) ("Defendant manifested a subjective expectation of privacy in his non-public Facebook content that society is prepared to recognize as reasonable."); *United States v. Bledsoe*, 630 F. Supp. 3d 1, 18 (D.D.C. 2022) (finding the "weight of persuasive authority hold[s] that non-public content held on social media accounts is protected under the Fourth Amendment" and citing cases).

In this case, the detective found the evidence at issue by reviewing appellant's private messages and his private subscriber information, which we find carry an objectively reasonable expectation of privacy. The trial court correctly concluded that the detective's warrantless search of appellant's Facebook records was in violation of the Fourth Amendment.

**The Good-Faith Exception to the Exclusionary Rule**

While the detective conducted an illegal search through the Facebook records, "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "To trigger the exclusionary rule, police conduct must be

4

sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. The good-faith exception to the exclusionary rule applies "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful . . . ." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

### (1) Good Faith Based on Lack of Binding Precedent

The State argues we should find that the detective had a good-faith belief that his conduct was lawful because no binding precedent holds that he was required to obtain a second warrant to search through the Theft Warrant evidence. However, the United States Supreme Court has held that "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities" and "[a]n officer who conducts a search in reliance on binding appellate precedent does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances." *Id.* at 241 (second alteration in original) (quoting *Leon*, 468 U.S. at 920); *see also Carpenter v. State*, 228 So. 3d 535, 542 (Fla. 2017) (declining to apply good-faith exception to exclusionary rule where officer relied on nonfinal, pipeline case still pending supreme court review). Thus, while an officer may reasonably rely on firm, binding precedent, the lack of binding precedent is not evidence of good faith. *See Carpenter*, 228 So. 3d at 541 (holding that application of exclusionary rule would further deterrence of unlawful police conduct because "officers would now, in areas of unsettled law, be reminded to err on the side of caution by obtaining a search warrant instead of relying on nonfinal, unsettled questions of law . . .").

### (2) Good Faith Based on Reasonable Reliance on the Theft Warrant

Without legal precedent, the trial court found that the detective reasonably believed the Theft Warrant authorized him to search the Facebook records for evidence of homicide. To determine whether an officer had an objectively reasonable belief that a search was authorized by a warrant, "courts must assess, whether, given the totality of the circumstances, an officer 'armed with the information possessed by the officer who conducted the search' would have believed the warrant to be valid." *State v. Sabourin*, 39 So. 3d 376, 384 (Fla. 1st DCA 2010) (quoting *Leon*, 468 U.S. at 922).

5

To obtain a search warrant, an officer must submit an affidavit "set[ting] forth facts establishing two elements: (1) the commission element—that a particular person has committed a crime; and (2) the nexus element—that evidence relevant to the probable criminality is likely to be located in the place searched." *State v. Hart*, 308 So. 3d 232, 235 (Fla. 5th DCA 2020). Further, "a search warrant must contain a particular description of the items of property it authorizes the officers to seize." *State v. Eldridge*, 814 So. 2d 1138, 1140–41 (Fla. 1st DCA 2002). The particular description can describe either specific items or, as in the instant case, a certain character of property to be seized. *Id.* at 1141. Our supreme court has commented that "the particularity requirement stands as a bar to exploratory searches by officers armed with a general warrant," and "the requirement limits the searching officer's discretion in the execution of a search warrant, thus safeguarding the privacy and security of individuals against arbitrary invasions by governmental officials." *Carlton v. State*, 449 So. 2d 250, 252 (Fla. 1984).

Here, while the Theft Warrant authorized officers to search through a large amount of appellant's Facebook data, the warrant authorized such a search for evidence relevant to proving only theft or fraud. Nonetheless, the State argues it was reasonable for the detective to believe that that the Theft Warrant gave him authority to search the Facebook records for evidence of homicide.

The Michigan Supreme Court heard a similar issue in *People v. Hughes*, 958 N.W.2d 98 (Mich. 2020), where the court considered "whether, when the police obtain a warrant to search digital data from a cell phone for evidence of a crime, they are later permitted to review that same data for evidence of another crime without obtaining a second warrant." *Id.* at 104. In *Hughes*, the defendant was involved in an armed robbery as well as unrelated drug trafficking. *Id.* at 105. A detective obtained and executed a search warrant for drug trafficking and seized the defendant's cell phone. *Id.* Later, the prosecutor in the armed robbery charges requested that the detective conduct a further search of the cell phone data for evidence related to the armed robbery. *Id.* at 106. Over the defendant's objection, the prosecutor used the cell phone evidence at the armed robbery trial, where the defendant was found guilty. *Id.* at 106–07. The defendant appealed, arguing that the phone records should have been excluded because the warrant supporting the cellphone extraction only authorized a search for evidence of drug trafficking. *Id.* at 107. After the court of appeals affirmed, the case proceeded to the Michigan Supreme Court. *Id.*

The Michigan Supreme Court held that "a warrant authorizing the police to seize and search cell-phone data allows officers to examine the seized data only to the extent reasonably consistent with the scope of the warrant." *Id.* at 111. The court wrote that "[w]hile it may have been reasonable for officers to seize all of defendant's cell-phone data pursuant to the warrant to prevent the destruction of evidence and to isolate incriminating material from nonincriminating material, it was not necessarily reasonable for police to review that data without limitation." *Id.* The court explained, like any search pursuant to a warrant, "a search of digital data from a cell phone must be 'reasonably directed at uncovering' evidence of the criminal activity alleged in the warrant and that any search that is not so directed but is directed instead toward finding evidence of other and unrelated criminal activity is beyond the scope of the warrant." *Id.* at 115 (quoting *United States v. Loera*, 923 F.3d 907, 917, 922 (10th Cir. 2019)).

Turning to the defendant's case, the Michigan Supreme Court held that the armed robbery search did not meet this test because the drug trafficking warrant made no mention of any armed robbery, and the armed robbery search was conducted separately about a month after the lawful data extraction. *Id.* at 121. The court's conclusion is consistent with case law in other jurisdictions. *See People v. McCavitt*, 185 N.E.3d 1192, 1212 (Ill. 2021) ("We are persuaded by *Hughes* that an officer's search of seized digital data, as with any other search with a warrant, must be reasonably directed at finding evidence of the criminal activity identified within the warrant."); *State v. McDonnell*, 297 A.3d 1114, 1144 (Md. 2023) (holding that police violated Fourth Amendment by searching digital information copied with defendant's consent, because defendant's consent was withdrawn after police copied information but before they searched through it, and the police did not obtain a warrant to search through the data after the consent was withdrawn); *United States v. Hulscher*, No. 4:16–CR–40070–01, 2017 WL 657436, at *3 (D.S.D. Feb. 17, 2017) ("According to the government, law enforcement agencies can permanently save all unresponsive data collected from a cell phone after a search for future prosecutions on unrelated charges . . . . Under the government's view, law enforcement officers could get a warrant to search an individual's cell phone for minor infractions and then use the data to prosecute felony crimes. No limit would be placed on the government's use or retention of unresponsive cell phone data collected under a valid warrant.").

After finding that the warrantless search for armed robbery evidence violated the Fourth Amendment, the Michigan Supreme Court reversed and remanded for the court of appeals to consider whether any exceptions

7

to the exclusionary rule, including the good-faith exception, applied to the case. *Hughes*, 958 N.W.2d at 123 n.27. Upon that remand, the Michigan Court of Appeals ruled that the good-faith exception did not apply and reversed and remanded the case to the trial court for a new trial, without the evidence obtained from the armed robbery search. *People v. Hughes*, 981 N.W.2d 182, 192 (Mich. Ct. App. 2021), *rev den.*, 970 N.W.2d 337 (Mich. 2022). In deciding against the good-faith exception, the Michigan Court of Appeals wrote:

> The prosecutor argues that [the good-faith] exception applies in this case because Detective Wagrowski was acting in objective good-faith on the warrant. However, the search of the cell phone data for evidence of armed robbery was not authorized by the warrant and therefore the officer was not relying on the magistrate's finding of probable cause. Instead, the search was conducted at the request of the prosecutor, who erroneously determined that a second search warrant was not necessary. But unlike a magistrate, the prosecutor is not a neutral and detached decision-maker but rather is part of the "law enforcement team." Because the unlawful search was not attributable to an error made by a neutral and detached magistrate, the rationale underlying the good-faith exception does not apply in this case.

*Id.* at 190 (internal citations omitted).

In this case, the detective testified that after the motion to suppress the Facebook murder search warrant was granted, the prosecutor inquired about getting the Facebook data with a subpoena, and the detective informed the prosecutor that appellant's Facebook records had been seized pursuant to the Theft Warrant some time earlier. Thus, the prosecutor knew of the existence of the Facebook data subject to a prior, unrelated warrant and also knew that the court had suppressed the data compiled pursuant to a warrant in the instant homicide case. The detective then obtained the Facebook records from the Theft Warrant and, without applying for his own search warrant, searched through these records, finding the evidence at issue to give to the prosecutor. Thus, like the illegal search in *Hughes*, Detective Evans's search was conducted at the prosecutor's request and was therefore attributable to the "law enforcement team," rather than a neutral magistrate. *Hughes*, 981 N.W.2d at 190.

Appellant's Facebook records were seized and retained pursuant to the Theft Warrant, and the detective's subsequent search through those records for homicide evidence therefore violated the Fourth Amendment. We hold that these circumstances do not fit the good-faith exception to the exclusionary rule, as it was not objectively reasonable for the detective to believe that the Theft Warrant, which authorized a search of appellant's Facebook records for evidence of theft and organized fraud, authorized him to search the same records for evidence of an unrelated homicide.[2]

**Exclusion as a Deterrent**

### (3) Whether Exclusion Is Warranted to Deter Illegal Police Conduct

Finally, in determining whether exclusion is warranted in this case, we must determine whether the benefits of deterring illegal police conduct outweigh the costs of exclusion. *See Carpenter*, 228 So. 3d at 541–42. In *Hughes*, the Michigan Court of Appeals wrote:

> The prosecutor argues that there is no police misconduct worthy of deterrence because at the time of the search no court had held that a second search warrant is necessary under the circumstances of this case and thus [the detective] did not knowingly violate the law. Were we to agree with this argument, however, we would effectively be holding that when the law is unsettled, an officer or the prosecutor is free to make an independent conclusion concerning the legality of a search or seizure, and even if a court subsequently disagrees

---

[2] Searches and seizures of social media accounts is a relatively undeveloped area of law. Regarding seizures, the federal courts have emphasized minimization of the amount of data seized. The D.C. federal district court has offered some guidance on seizing digital information in compliance with the Fourth Amendment, "due to the current 'reality that over-seizing is an inherent part of the electronic search process' that gives the government 'access to a larger pool of data that it has no probable cause to collect[.]'" *In re the Search of Information Associated With the Facebook Account Identified By the Username Aaron.Alexis That Is Stored At Premises Controlled By Facebook, Inc.*, 21 F. Supp. 3d 1, 8 (D.D.C. 2013). The D.C. district court began issuing "secondary orders" following search warrants for electronic records, requiring that all content and records not relevant to the investigation be returned or destroyed, and specifying that such records cannot be kept by the government. *Id.* at 10. This case offers a method of complying with the particularity requirement of a search warrant when searching and seizing digital data.

with that conclusion, the illegally obtained evidence will not be suppressed. Under this approach, an officer would have an incentive *not* to seek a warrant when caselaw is unclear because the request might be denied . . . . Thus, allowing the admission of illegally obtained evidence in these types of cases is not consistent with Fourth Amendment jurisprudence as it invites, rather than deters, future unlawful searches and seizures.

981 N.W.2d at 191.

Additionally, our supreme court has written that when dealing with areas of unsettled law:

The deterrent benefits of exclusion . . . outweigh the societal costs because exclusion reminds law enforcement officers that warrantless searches are the exception to the rule and that this exception should only be used when <u>specifically authorized</u> by law. The rule on searches in questionable areas of law is simple and unequivocal: Get a warrant.

*Carpenter*, 228 So. 3d at 542.

Likewise, we find that applying the good-faith exception here would incentivize warrantless searches under unsettled areas of law, while the Fourth Amendment requires a warrantless search to be specifically authorized by law. We hold that the trial court abused its discretion in denying appellant's motion to suppress the Facebook records based on the good-faith exception to the exclusionary rule.

**Harmless Error**

Lastly, we must decide whether the trial court's erroneous denial of appellant's motion to suppress was harmless beyond a reasonable doubt. *E.g., Connor v. State*, 803 So. 2d 598, 609 (Fla. 2001). The harmless error test "places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

Here, the Facebook records were important in proving that appellant was the person whom Carn had called after saying she was going to call

her "baby daddy" to "come shoot" the other women. At trial, the State produced a red iPhone recovered from Carn's home, with the same international mobile equipment identifier (IMEI) as the IMEI belonging to the phone number which Carn had called after threatening to call her "baby daddy." While the matching IMEIs were proof that the red iPhone was the phone which Carn had called, the phone had been deactivated and detectives were unable to extract data from it, so the State relied on the Facebook records to prove that this phone and its phone number belonged to appellant. The State introduced this phone number's call logs, and after appellant objected and argued that there was no proof the phone number belonged to him, the State argued that the IMEI number was linked to appellant through the Facebook records.

Thus, the Facebook records were important to linking appellant to the phone number which Carn had called after making threats and calling her "baby daddy," considering appellant is not the only father of Carn's children. The Facebook records also contained the picture of appellant wearing gold teeth and brandishing a gun similar to the murder weapon. While the State called several witnesses, none testified that they had clearly seen appellant fire the shots in question. Rather, the witnesses testified that they had seen a man with gold teeth carrying a long gun, whom they believed to be appellant. The picture, obtained through the detective's unconstitutional search, matches that description, and could have led the jury to believe the witnesses' identification. The State also referenced both the phone call to Carn's "baby daddy" and the picture of appellant as proof of appellant's identity in its closing arguments. We cannot conclude that the admission of the Facebook records was harmless beyond a reasonable doubt.

### *Conclusion*

Although the trial court correctly concluded that the detective's warrantless search through appellant's Facebook records violated the Fourth Amendment, the court abused its discretion in applying the good-faith exception to the exclusionary rule. Good faith cannot be based on the lack of binding precedent, and it was not objectively reasonable for the detective to believe that the Theft Warrant authorized him to search the Facebook records for evidence of homicide. Finally, the error was not harmless, as the evidence from the Facebook records was important to identifying appellant as the shooter. We reverse and remand for a new trial, at which the Facebook records may not be admitted.

*Reversed and remanded.*

GERBER and KUNTZ, JJ., concur.

* * *

*Not final until disposition of timely filed motion for rehearing.*